George APOSTLE and Joan Apostle, Plaintiffs,

v.

BOOTH NEWSPAPERS, INC., Defendant.

No. G82–721.

United States District Court, W.D. Michigan, S.D.

Jan. 31, 1983.

---

Paul M. Ladas, Muskegon, Mich., John A. Burgess, Berkeley, Cal., for plaintiffs.

William M. Newman, Landman, Luyendyk, Latimer, Clink & Robb, Muskegon, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

On September 17, 1982, Plaintiffs filed this diversity action against Defendant Booth Newspapers, Inc., alleging that two newspaper articles had falsely implied that Plaintiffs and their businesses were connected with prostitution in the Muskegon Heights business district. The articles in question appeared on page 1B of the September 20, 1981 edition of the Muskegon Chronicle, a newspaper owned and published by Defendant.

The two articles appeared with accompanying headlines, photographs and captions; all address a purported problem of prostitution in Muskegon Heights. Certain statements quoted in the articles identified the Gay Nineties Bar as the center of that activity. Both Plaintiffs are identified in the articles, Mr. Apostle as the owner and operator of the Gay Nineties Bar and the Balbirnie-Apostle Funeral Home, and Ms. Apostle as the wife of Mr. Apostle and an "occasional bartender" at the Gay Nineties. The second of the two articles is written as an exposition of Plaintiffs' reaction on the subject of the prostitution problem and statements about the Gay Nineties, and contains several quotations attributed to Plaintiffs.

Plaintiffs' Complaint contains four counts, denominated as: defamation, republication, negligent infliction of emotional distress, and intentional infliction of emotional distress. Defendant has filed an Answer as to the first two counts; presently before the Court is Defendant's Motion to Dismiss the count for negligent infliction of emotional distress, and for summary judgment on the claim of intentional infliction of emotional distress.

## I. Negligent Infliction of Emotional Distress

Defendant argues that, for several reasons, Plaintiffs' Count III for negligent infliction of emotional distress fails to state a claim and should be dismissed pursuant to

Federal Rules of Civil Procedure (FRCP) 12(b)(6). Because Count III of the Complaint incorporates by reference the allegations of Count I (defamation), the Court must examine both Counts to determine if together they state a claim for negligent infliction.

Count I states that Mr. Apostle is the owner of the State Cafe and Gay Nineties Bar, and the Balbirnie-Apostle Funeral Home, and that he was identified as such in the newspaper articles. Plaintiffs allege that Defendant harbored ill will toward the Plaintiffs and intended to harm them emotionally and in their reputations and businesses, by unnecessary reference to the funeral home and by unnecessarily identifying Ms. Apostle as an occasional bartender at the Gay Nineties. Plaintiffs further point to specific portions of the articles, headlines and captions which they allege were meant to and do imply that Plaintiffs and their businesses are involved in prostitution activities in Muskegon Heights.[1] Plaintiffs claim that any implication that Plaintiffs or their businesses are associated with or involved in immoral and criminal acts, is untrue. Count I further alleges that prior to publication, Defendant knew or should have known the injurious effect the articles would have on Plaintiffs, their reputations, and their businesses; that Defendant intended such effect; that the Defendant knew that the articles and inferences to be drawn therefrom were false, and published

---

1. Complaint, paragraph 10:

In the September 20, 1981 edition of "The Muskegon Chronicle", the defendant printed and published defamatory statements relating to and concerning the plaintiffs, including but not limited to the following:

A. "Heights police chief, William R. Howell, contends that the Gay Nineties is the center of porstitution [sic] in the City of Muskegon Heights."

B. "Police characterized the bar as the center of prostitution."

C. "Action on the sidewalk at the Gay Nineties Bar on weekday nights". (This phrase was used in connection with two photographs of the front of the Gay Nineties Bar and State Cafe in the context and circumstances clearly leading to the innuendo and inference that prostitution activity was

shown in said photograph arising from and in connection with the activities in the Gay Nineties Bar)

D. "If the Gay Nineties wasn't there, it would help the whole Heights business district."

E. "I parked the car on Broadway just west of the Strand Theatre entrance. Across the street a young lady in a maroon dress ducked into the doorway of the Gay Nineties Bar, quickly reappeared and looked around. She cross over, came around to the passenger's side and knocked on the window."

F. "She smiled as I leaned over and rolled down the window. 'Thanks anyway.'" "'But I'm meeting someone.'" "She moved on past the theatre and turned the corner. I looked at my watch. It was 1:45 in the afternoon."

them with reckless disregard for the truth; and that Defendant refused to retract or apologize for the articles. Plaintiffs aver that they had previously enjoyed a good reputation, and that as a result of the publication, Mr. Apostle suffered damage to his businesses, a reduction in property values, and emotional and physical distress.

Count III alleges in addition that Defendant refused Plaintiffs' offer of an opportunity to conduct a fair and thorough investigation of the facts. Plaintiffs claim that Defendant had a legal duty to exercise reasonable care in its investigation so as to uncover all the facts; to verify the accuracy of quotations and the fairness and accuracy of its articles generally; and to follow "accepted journalistic standards" in preparing, editing and publishing the articles. According to Plaintiffs, Defendant negligently and carelessly failed to exercise the due care required by this legal duty. As a result, Plaintiff suffered emotional distress, emotional suffering, and emotional injury and damage which were or should have been reasonably foreseeable by the Defendant.

### A. Scope of the Tort of Negligent Infliction of Emotional Distress

■ Defendant argues that the tort of negligent infliction of emotional distress is confined to those instances when Plaintiff suffers an emotional shock as the result of witnessing the negligent injury of a close relative; since this case does not fit the "third party injury" mold, Defendant argues, Plaintiffs' allegations fail to state a claim. Furthermore, Defendant claims that the Michigan courts have indicated a reluctance to extend the tort beyond these narrow limits.

The majority of Michigan cases dealing with the tort of negligent infliction of emotional distress do involve the third party injury situation. *See, e.g., Toms v. McConnell,* 45 Mich.App. 647, 207 N.W.2d 140 (1973); *Gustafson v. Faris,* 67 Mich.App. 363, 241 N.W.2d 208 (1976); and *Perlmutter v. Whitney,* 60 Mich.App. 268, 230 N.W.2d 390 (1975). However, the Michigan Supreme Court has clearly recognized that when emotional shock is inflicted on the plaintiff by negligent conduct of the defendant which is felt directly by the plaintiff, a cause of action may lie for emotional distress. *Daley v. LaCroix,* 384 Mich. 4, 179 N.W.2d 390 (1970); *and see, Allinger v. Kell,* 102 Mich.App. 798, 302 N.W.2d 576, *modified on other grounds,* 411 Mich. 1053, 309 N.W.2d 547 (1981). In *Daley* the court held that plaintiffs stated a claim for negligent infliction of emotional distress, even though no third party was involved. Plaintiffs alleged that they suffered an emotional shock when defendant's car negligently struck a utility pole, which brought down electrical lines and caused an electrical explosion at plaintiffs' house when they were inside. While the instant case presents a factual context distinct from that of *Daley,* the underlying claim of emotional injury felt as the direct result of Defendant's conduct, is the same.

Defendant's argument that the courts are reluctant to apply this tort to new cases is not persuasive in this instance. Michigan courts have been willing to impose limitations on the tort in the third party injury context, where there would otherwise be potentially unending liability for the "shock waves" which flow outward infinitely from an injury. The same analysis does not apply when no third party is involved, as here. Furthermore, in at least one case, the Court has noted in the third party injury context that the courts of this state are always ready to give a remedy where a wrong has been committed, and that a "floodgates" argument will not dissuade them from that result. *Toms v. McConnell, supra.*

I find that Plaintiffs' allegations fall within the scope of the tort of negligent infliction of emotional distress, as defined by the Michigan courts.

### B. Necessity of Allegations of Physical Injury

■ One of the required elements of the tort of negligent infliction of emotional distress in this state is "a definite and objective physical injury ... produced as a result of emotional distress proximately

caused by defendant's negligent conduct...." *Daley v. LaCroix, supra,* 384 Mich. at 12, 179 N.W.2d 390. By contrast, when the infliction of emotional distress is *intentional,* no physical injury is required. *See, e.g., Warren v. June's Mobile Home Village and Sales, Inc.,* 66 Mich.App. 386, 239 N.W.2d 380 (1976). Defendant argues that Plaintiffs' Complaint fails to state a claim because physical injury is not alleged. Paragraph 33 of Count III states, in pertinent part:

33. ... the plaintiffs herein were, by the publication directly and proximately caused intense and severe emotional distress, emotional suffering, emotional injury and damage;

Paragraph 21 of Count I, incorporated by reference into Count III, alleges:

21. As a result of such defamatory statements and the aforementioned imputations directed at George Apostle, George Apostle suffered a loss of business in both his bar business and funeral business, a reduction in his property values, emotional and mental distress, anxiety, aggravation, physical distress, pain and suffering, embarrassment, mental anguish, and humiliation, past, present, and future.

■ While a "definite and objective physical injury" is required, the courts are very lenient in finding allegations sufficient in this regard. In *Daley v. LaCroix, supra,* the court held that an allegation of nervousness caused by the emotional shock was a borderline allegation, but that it presented a jury question on the issue of physical injury when viewed in the light most favorable to plaintiff. The other plaintiff in the *Daley* case had allegedly suffered weight loss, inability to perform ordinary household duties, extreme nervousness and irritability, and traumatic neurosis; this was held to clearly satisfy the leading requirements of physical injury. Similarly, in *Toms v. McConnell, supra,* the court held that allegations that plaintiff could not function and was in a continued state of depression were sufficient to state a claim. Of course, as the court pointed out in *Daley,* even given

this lenient standard, a plaintiff still has to show that the physical harm is the natural result of the emotional shock proximately caused by defendant's conduct.

■ Plaintiffs' allegations, at least as to Ms. Apostle, do not appear to meet the pleading requirement described by these cases. However, in response to Defendant's motion, Plaintiffs have submitted affidavits which clearly allege physical consequences of the emotional distress Plaintiffs claim to have suffered. Mr. Apostle attributes high blood pressure and chest pains to the nervousness caused by the publication, as well as "some loss of equilibrium and slight heart fibrillation." Ms. Apostle states in her affidavit that she has suffered nervousness, irritability, depression, and irregular and heavy menstrual periods, which her doctor told her could be attributable to her nervousness after the publication of the articles. Ms. Apostle also claims that since the publication she has experienced involuntary grinding of her teeth, and has been receiving treatment for this condition. In addition, she states that she has withdrawn from socialization with former friends and acquaintances.

Rule 12(b) allows the Court to consider materials outside the pleadings, when presented to the Court on a Motion to Dismiss for failure to state a claim. When such materials are considered the motion is to be treated as one for summary judgment. Accordingly, the affidavits submitted by Plaintiffs have transformed this motion into one for summary judgment. On the basis of the affidavits I find that Plaintiffs have adequately alleged definite and objective physical injury such that Defendant is not entitled to prevail as a matter of law; rather, the issue must be decided by the jury.

## C. *Validity of a Negligence Standard of Liability in Light of Defendant's Claim of Qualified Privilege*

■ Defendant argues that: Plaintiffs' defamation claim is subject to a qualified privilege of Defendant, because the subject matter of the publication was of public

interest; that Plaintiffs are therefore required to show that Defendant acted with knowledge of the falsity of the articles or with reckless disregard for the truth, in order to prevail on the defamation claim; that Plaintiffs' negligent infliction claim is based on the same grounds as the defamation claim; and therefore, to allow a negligence standard of liability to apply to Defendant's conduct is to circumvent the law of privilege in defamation. Since negligence does not meet the actual malice standard, Defendant argues that by definition a negligence claim is precluded.

Plaintiffs argue that defamation and negligent infliction are two separate and distinct torts, based upon protection of distinct interests, reputation and emotional well-being, respectively.[2]

Defendant's argument proceeds on two initial assumptions: (1) that a qualified privilege arises as to the defamation claim, because the articles were of public interest; and (2) that as a result, Plaintiffs must show Defendant acted with knowledge of falsity or reckless disregard for the truth. While neither of these assumptions is questioned by Plaintiffs, they merit inspection by the Court, in light of the combined effect of Michigan and constitutional case law in the area of defamation.

Michigan has long recognized that a qualified privilege may attach to a publication. *Bacon v. Michigan Central Railroad Company,* 66 Mich. 166, 33 N.W. 181 (1887), sets forth the general principle:

> Qualified privilege ... extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. *Id.* at 169–170.

This broad principle reflects a public policy decision that some communications are so necessary that, even if defamatory, they should be protected to some degree. *Lawrence v. Fox,* 357 Mich. 134, 97 N.W.2d 719 (1959); *Postill v. Booth Newspapers,* 118 Mich.App. 608, 619, 325 N.W.2d 511 (1982). Specifically, the courts in this state have allowed a qualified privilege to attach where there is a strong public interest in the subject matter of the publication. *Timmis v. Bennett,* 352 Mich. 355, 89 N.W.2d 748 (1958); *Bostetter v. Kirsch Company,* 319 Mich. 547, 30 N.W.2d 276 (1948); *and see, Bowerman v. Detroit Free Press,* 287 Mich. 443, 447, 283 N.W. 642 (1939).

> We think the doctrine of qualified privilege may properly be regarded as including statements made in good faith by a citizen of a community having, or claiming to have, special knowledge or information bearing on such matter of public concern and communicated to others concerned or interested. *Timmis v. Bennett, supra,* 352 Mich. at 369, 89 N.W.2d 748.

It seems clear that a newspaper may publish an article about the problem of prostitution within a community, with a qualified privilege. Neither of the parties here suggests otherwise.

By definition, a *qualified* privilege is defeasible. *Lawrence v. Fox, supra,* 357 Mich. at 141, 97 N.W.2d 719. The question here is what standard of fault will be applied to defeat the privilege and allow recovery. In 1959 the Michigan Supreme Court noted that "[t]here are few areas of the law so obscure in detail as that of the law of defamation." *Lawrence v. Fox, supra* at 136, 97 N.W.2d 719. The passage of time has served only to add further complexity.

In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court ruled that the First Amendment requires that a public official who sues the press for a defamatory publication

---

**2.** Plaintiffs also argue that FRCP 8(e) gives them the right to plead both theories, even if inconsistent. Defendant's argument is not a procedural one. Rather, Defendant seeks a ruling that *as a matter of law* a negligence claim may not be stated against it, because a qualified privilege defeats the tort in this instance. Rule 8(e) does not respond to the thrust of this argument.

must show that the defamatory language was published with knowledge of its falsity or with reckless disregard for whether or not it is false. This standard of fault was termed "actual malice," and the privilege it defeats may be called "constitutional privilege." In *Curtis Publishing Company v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the *New York Times* standard of fault was extended to defamation actions against the press by "public figures." *Gertz v. Welch,* 418 U.S. 323, 336, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). However, in *Gertz v. Welch,* the court refused to further extend the constitutional privilege and the actual malice requirement to instances where private individuals are defamed by the press. The court held instead, that the Constitution requires only that some fault be shown in such cases, and left the question of the standard of fault for the states.

■ In reaching this result the *Gertz* court rejected a "public interest" test for determining when a constitutional privilege should attach. 418 U.S. at 346. However, the rejection of the test by the Supreme Court has not resulted in the death of the public interest-based qualified privilege in Michigan; this privilege simply retains its "common law" source, rather than assuming constitutional proportion. *See, Peisner v. Detroit Free Press,* 82 Mich.App. 153, 266 N.W.2d 693 (1978) (hereinafter "*Peisner* I"); and, *Clark v. American Broadcasting Companies, Inc.,* 684 F.2d 1208 (CA 6 1982), for recent cases in which a qualified privilege is applied on the basis of the public interest in the subject matter of the publication. *And see, Postill v. Booth Newspapers, supra,* for a discussion of the coexistence of constitutional and common law defamation in Michigan.

Regardless of the continuity of this qualified privilege in Michigan—or perhaps because of the continuing role of that privilege in Michigan cases—the standard of fault to be applied in Michigan common law defamation cases, in the aftermath of *New York Times* and *Gertz,* is unclear. At common law, a qualified privilege is defeated by a showing of ill will, spite, or malice in fact. *Postill v. Booth Newspapers, supra,* 118 Mich.App. 619–620, 325 N.W.2d 511. Malice in fact means a "desire and intention to injure." *Bacon v. Michigan Central Railroad Company, supra,* 66 Mich. at 173, 33 N.W. 181. The language of one case indicates that a negligence standard may have been determinative of malice:

> The publications in question, being qualifiedly privileged, are not actionable unless made in bad faith, or with actual malice or *without reasonable cause* to believe them to be true.

> \* \* \* \* \* \*

> The fact that the charges were false is not sufficient to remove the privilege. It must further appear that the defendant knew them to be false or made them *without reasonable evidence of their truth,* or made them in bad faith with actual malice. *Fortney v. Stephan,* 237 Mich. 603, 610, 213 N.W. 172 (1927) (emphasis added).

In *Postill v. Booth Newspapers, supra,* the Court of Appeals commented that the proofs necessary in a common law action by private citizens against the press are less strict than those required in constitutional defamation cases by "public" persons. 118 Mich.App. at 619. Of course, at common law, where no privilege applied, the plaintiff simply was required to prove that the publication was untrue, and no showing of fault was required. Where a privilege attaches, the plaintiff must show both that the publication is untrue *and* that it was made with malice, as appropriately defined.

■ The parties here have assumed that *Peisner* I, states the law on the issue of the standard of fault or "malice" required to defeat the privilege which arises in this case. In *Peisner* I, the Court of Appeals held that a publication concerning plaintiff attorney, who was not a public figure, was qualifiedly privileged as a matter of public interest, and that the standard of fault to be applied was the actual malice standard of *New York Times,* i.e. knowledge of falsity or reckless disregard for the truth. The *Peisner* I court noted that the Michigan

Supreme Court had not ruled on the question of the standard of fault to be applied in cases brought by private individuals against the press, in light of *Gertz. Peisner* I used a balancing test set forth in the case of *Lawrence v. Fox, supra,* to determine that a qualified privilege should attach, then automatically invoked the actual malice test of *New York Times.* The case was appealed again after trial, and in *Peisner v. Detroit Free Press,* 104 Mich.App. 59, 304 N.W.2d 814 (1981) (hereinafter *"Peisner* II"), the Court of Appeals upheld its earlier ruling on the standard of fault required. The court reasoned on the second appeal that the supreme court had indicated in *Arber v. Stahlin,* 382 Mich. 300, 170 N.W.2d 45 (1969), that the "actual malice" standard of *New York Times* should be imposed. This reliance was somewhat misplaced. As the Court of Appeals in *Postill v. Booth Newspapers, supra,* has observed, the *Arber* court discussed the actual malice standard in the context of what the lower court had found to be public officials. The court specifically refused to tackle the issue of whether in fact that finding was correct and whether consequently the standard of fault should be different. Rather the court merely noted that the *New York Times* standard is controlling if plaintiffs are public persons. *See, Postill v. Booth Newspapers, supra,* for a general discussion of this problem, 118 Mich.App. at 620 fn. 2, 325 N.W.2d 511. The Sixth Circuit has followed *Peisner* in automatically applying the *New York Times* standard when a qualified privileges arises, even though plaintiffs are neither public officials nor public figures. *Schultz v. Newsweek, Inc.,* 668 F.2d 911 (CA 6 1981); *Clark v. American Broadcasting Companies, Inc.,* 684 F.2d 1208 (CA 6 1982).

While, as a matter of constitutional law, Michigan must apply the actual malice standard of the *New York Times* case where public officials and public figures are involved, the same result is not required in cases of common law privilege. *Gertz v. Welch, supra.* Michigan could have retained its common law malice standard in cases brought by private citizens against the press where a public interest was in-

volved, even in the wake of *Gertz,* since Michigan had always required at least negligence to defeat the privilege. *Fortney v. Stephan, supra.* The question presented here is whether Michigan has instead altered the standard of fault in common law defamation, so as to require more than mere negligence to defeat the privilege. It appears that the Court of Appeals in this state have chosen to alter the common law standard somewhat, although no reason has been clearly enunciated for doing so. Perhaps the cases reflect a desire on the part of the Michigan Court of Appeals to retain a distinction in the standards of fault required in cases involving public interest, as compared to those where no public interest is involved in the publication. The result appears to be a combined standard of common law and constitutional malice. Michigan cases decided after *Gertz* indicate that bad faith, ill will, and intent to injure (common law malice) will still defeat the privilege in suits by private citizens. However the same cases indicate that mere negligence may no longer allow plaintiffs to prevail against the press where the public interest is involved. *See, Peisner* II, *supra,* 104 Mich.App. at 64, 304 N.W.2d 814; *Tumbarella v. Kroger,* 85 Mich.App. 482, 495–496, 271 N.W.2d 284 (1978); *Iacco v. Bohannon,* 70 Mich.App. 463, 467, 245 N.W.2d 791 (1976); *Walker v. Cahalan,* 542 F.2d 681, 685 (CA 6 1976). These cases instead use a standard of malice which includes reckless disregard for the truth. In *Postill,* the latest case which discusses the subject, the Court does not specifically define the standard of fault as negligence or recklessness, but merely states that the standard of fault is less than constitutional actual malice.

In the present case, Plaintiffs have pleaded both ill will and recklessness; the only negligence claim arises in the context of negligent infliction of emotional distress. Because the parties proceed on the assumption that negligence will not defeat the qualified privilege in a defamation claim, and in light of the cases discussed above, it appears that Plaintiffs may defeat Defendant's privilege by showing bad faith, ill will,

or intent to harm Plaintiffs, but that mere negligence in the publication, while constitutionally permissible, will not be sufficient proof under the Michigan law of privilege. Of course, proof of knowledge of falsity or reckless disregard for the truth, will also prove the common law malice of ill will. *Postill v. Booth Newspapers supra,* 118 Mich.App. at 621, 325 N.W.2d 511.

Having resolved this question, the Court must now consider Defendant's argument that since negligence will not defeat the privilege within the context of the defamation claim, Plaintiffs should not be allowed to circumvent the privilege by their claim of negligent infliction of emotional stress.

 It is clear that in Michigan negligent infliction of emotional distress is a separate and distinct tort. *E.g., Daley v. LaCroix, supra; Toms v. McConnell, supra.* It is also apparent that in Michigan a plaintiff in a defamation action may recover for emotional distress as well as injury to reputation. *Cribbs v. Yore,* 119 Mich. 237, 77 N.W. 927 (1899); *Poledna v. Bendix Aviation Corporation,* 360 Mich. 129, 103 N.W.2d 789 (1960). Negligence does not rise to the level of recklessness. *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Beyond these general principles, Defendant's argument poses an issue which appears to be one of first impression for Michigan, as well as for the Sixth Circuit.

 In *Campos v. Oldsmobile Division, General Motors Corporation,* 71 Mich.App. 23, 246 N.W.2d 352 (1956), relied upon by Plaintiffs, plaintiff alleged that while he was an employee of defendant, he had been wrongfully accused of possession of marijuana, which caused him to suffer damage to his reputation and to his mental well-being. The lower court held that the action was barred by the one year statute of limitations applicable in slander actions. The Court of Appeals held that to the extent that plaintiff stated damage to his mental well-being, it was an allegation of intentional infliction of emotional distress, which was governed by a three year statute of limitations. The court noted that intentional infliction is recognized as a separate cause of action which does not need to be "parasitic" to a defamation claim: Intentional infliction of emotional distress deals with invasions of emotional tranquility, while slander is based in protection of reputational interest. The court reasoned that a confusion arises because mental suffering is an element of damages in slander, but since the two torts protect different interests, they must be recognized as separate even when based upon the same conduct. The same logic can be applied to negligent infliction claims where defamation is also alleged. It should be noted, however, that the *Campos* court was not dealing with a situation where a privilege applied to change the standard of liability as to the defamation claim.

I have discovered few cases which deal with the problem presented here. Those cases which I have found indicate that where both defamation and another similar tort arise out of the same facts, consistency requires that the same standard of liability be applied to both torts. *Fitzgerald v. Penthouse International, Ltd.,* 525 F.Supp. 585 (D.C.Md.1981); *Dresbach v. Doubleday & Company, Inc.,* 518 F.Supp. 1285 (D.C.D.C.1981). In *Fitzgerald,* plaintiffs' claims included libel, invasion of privacy (under a "false light" theory), and other torts, allegedly arising out of defendant's publication of an article on the Navy and CIA's use of animals for military and intelligence purposes. The court found that plaintiff was a "limited public figure," requiring a showing of malice for recovery in defamation. Since plaintiff's privacy claim had as its basis the same allegedly false material, the court held that plaintiff had to prove actual malice:

> Given the close theoretical relationship between a claim for defamation and a "false light" suit for invasion of privacy, ... the court holds that when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, the plaintiff must prove actual malice in

order to recover on the "false light" claim. 525 F.Supp. at 603.

The court reached this result even though it commented that were it required to decide what constitutional standard applied in a false light case, it would probably find negligence sufficient.

In the *Dresbach* case, the court held that since the District of Columbia only requires negligence in defamation cases involving a private individual, that standard would also be applied to a false light action, reasoning that there was no basis for distinguishing invasion of privacy from defamation actions in that regard. 518 F.Supp. at 1288.

Here, Plaintiffs' claim for negligent infliction of emotional distress arises solely out of the circumstances which give rise to Plaintiffs' defamation claim. In fact, the Plaintiffs' claim for negligent infliction of emotional distress incorporates entirely the allegations regarding defamation. Plaintiffs' defamation claim includes an allegation of emotional injury, as does the negligent infliction claim. Even if precluded from pursuing a negligence claim, Plaintiffs will be able to seek damages for emotional distress allegedly caused by the publication under their defamation theory, as long as bad faith or intent or reckless disregard for the truth is shown. I agree with the reasoning of the courts in the *Fitzgerald* and *Dresbach* cases cited above, and find that here, where the same factual basis is used to make both defamation and negligent infliction of emotional distress claims, and where a qualified privilege applies to the publication, as a matter of law Plaintiffs' negligence claim cannot survive.

However, because the standard of fault to be applied in defamation actions by private plaintiffs against the press where the subject matter is one of public interest, has not been clearly resolved by the Michigan courts,[3] Defendant's motion as to Count III is granted without prejudice. The parties are urged to study, and give some thought to, the question of what the Michigan

courts mean by the standard of liability they have enunciated. Is it any different from the "actual malice" test of the *New York Times* case? The Plaintiff may submit a brief on this question within 20 days of the date of this Opinion; Defendant may reply within 10 days thereafter.

## II. Intentional Infliction of Emotional Distress

Plaintiffs' Count IV, for intentional infliction of emotional distress incorporates the allegations of the defamation claim (Count I), which are described above. Count IV additionally alleges that Defendant knew that Plaintiffs had no connection with prostitution and did not profit from prostitution, and that even if the Plaintiffs' bar was in any way associated with prostitution, it was unnecessary and unreasonable to further associate by reference Plaintiffs' funeral business with prostitution. According to Plaintiffs, despite knowledge that Plaintiffs were not associated with prostitution, the Defendant with intent to harm Plaintiffs' emotional stability, published the defamatory material. Plaintiffs allege that as a result they suffered intense emotional distress, emotional illness and loss of composure.

Defendant has moved for summary judgment on this Count, pursuant to FRCP 56. In support of its motion, Defendant makes two arguments: (1) that as a matter of law Defendant's conduct could not reasonably be found to be extreme and outrageous; and (2) that the publication was privileged and therefore no cause of action for intentional infliction of emotional distress may prevail.

### A. Extreme and Outrageous Conduct

 It is undisputed that Michigan recognizes the tort of intentional infliction of emotional distress, as defined by the Restatement (2d) Torts, § 46. *Frishett v. State Farm Mutual Automobile Insurance Company,* 3 Mich.App. 688, 143 N.W.2d 612

---

**3.** *See, Arber v. Stahlin, supra. And compare, Peisner* I and II, *supra;* and *Postill v. Booth*

*Newspapers, supra.*

(1966); *Warren v. June's Mobile Home Village and Sales, Inc., supra*. The restatement definition of the tort contains four elements: (1) "extreme and outrageous" conduct; (2) injurious intent or reckless disregard for the consequences of acts; (3) causation; and (4) the actual experience of severe emotional distress. The Complaint must show evidence of all four of these in order for the claim to go to the jury. *Ross v. Burns*, 612 F.2d 271 (CA 6 1980). The *Frishett* and *Warren* cases explicitly adopt the standards discussed in the restatement to determine whether conduct is "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Restatement (2d), Torts, § 46, comment d.

 Defendant argues that as a matter of law the conduct of Defendant does not rise to the level of "extreme and outrageous" conduct required by the tort of intentional infliction of emotional distress, even if the articles are untrue. Defendant argues that the Court may properly decide this question on summary judgment, if it determines that a reasonable jury could not find the conduct extreme and outrageous. Plaintiffs, on the other hand, argue that this is an issue of fact and that the implication of the article that Plaintiffs operate a bar which is the center of prostitution and that therefore Plaintiffs assist in prostitution and that their funeral home is also connected, is outrageous. Plaintiffs of course have alleged that any implication that they or their businesses are in any way connected with prostitution, is false. In addition, Plaintiffs have submitted the affidavit of the Muskegon Heights police chief, attached as an exhibit to Plaintiffs' Complaint. Chief Howell's affidavit indicates that he did not advise the Muskegon Chronicle reporter that the Gay Nineties Bar was the center of prostitution, that he had pointed out other areas where prostitution was a problem, and that he was not "going after" Plaintiffs' liquor license. These fact assertions are taken to be true for the purposes of this motion.

The gap between conduct which leads one to exclaim "outrageous," and conduct which can be characterized as "petty oppression," is a large one, and has led the courts to both deny and grant motions for summary judgment on this point. In *Frishett v. State Farm Mutual Automobile Insurance Company, supra,* the Michigan Court of Appeals reversed a summary judgment against plaintiff, holding that plaintiff stated a claim for intentional infliction of emotional distress. Plaintiff alleged that she was in a car accident where her husband was killed and her daughter injured, that defendant insurer was the carrier for both cars involved in the accident, and that defendant had made false statements, unjustly withheld medical payments, and that its agents had obtained private information for the insurer to use in its role as insurer for the other car. A summary judgment was also reversed by the Court of Appeals in *Ledsinger v. Burmeister*, 114 Mich.App. 12, 318 N.W.2d 558 (1982). The court in that case held that where plaintiff had gone into defendant's store to pick up some car parts and defendant allegedly called plaintiff a "nigger" and told plaintiff to get his "black ass" out of the store and said that he did not need "nigger" business, the court could not say that as a matter of law it was not extreme and outrageous. The court noted

that the language used should be viewed in its context, and that the court should also take into consideration the fact of abuse of a relationship, such as that of a merchant to a customer.

In *Fry v. Ionia Sentinel-Standard,* 101 Mich.App. 725, 300 N.W.2d 687 (1980), the court held that defendant publisher's conduct could not be characterized as outrageous. Defendant had printed a story about the death of plaintiff's husband in a fire. The story identified plaintiff as the man's wife, and also stated that another body, of a woman, was found with the body of plaintiff's husband and that that woman had been seen with plaintiff's husband earlier that evening in a nearby bar. Similarly, in *Ross v. Burns, supra,* the Sixth Circuit, applying Michigan law, held that an undercover narcotics agent did not show extreme and outrageous conduct where two newspaper reporters took his picture and ran a story decrying the use of undercover narcotics agents, using the caption "know your enemies" with the agent's picture. In that case the court noted that the news article was on a topic of current controversy, and viewing the conduct element of the tort separately from intent issues, reversed the lower court's denial of a motion for a judgment nov.

The abuse of the relationship between a news reporter, and a subject of that report may be so extreme as to rise to the level of extreme and outrageous conduct defined by the cases. While the Court may in some cases resolve the question on a motion for summary judgment, summary judgment is not appropriate where the facts surrounding the conduct are contested. In this case, the conduct at issue includes not only the fact of the contents of the articles themselves, but the manner in which the facts were investigated and reported. In light of the affidavit of Chief Howell, and in light of all the evidence viewed in favor of Plaintiffs I find that there are facts material to this issue which remain contested. Although the court in *Ross v. Burns, supra,* held that as a matter of law defendant's conduct was not extreme and outrageous, the court had the benefit of making that

determination in light of all of the testimony adduced at trial, since the ruling was on a motion for a judgment nov. And in *Fry v. Ionia Sentinel-Standard, supra,* where the court also upheld a summary judgment for defendant, there was no dispute that the facts contained in the publication were true. For those reasons, the instant case is distinguishable, and Defendant's Motion for Summary Judgment on this Count is denied.

### B. The Application of Privilege to this Claim

■ Defendant argues that regardless of whether or not the conduct may be considered extreme and outrageous, the publication is protected by a common law privilege. In *Frishett v. State Farm Mutual Automobile Insurance Company, supra,* the court quoted the principle of liability for intentional infliction of emotional distress enunciated in the Restatement of the Law, 1948 (Supp), Torts, § 46:

One who, *without a privilege to do so,* intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it. 3 Mich.App. at 692, 143 N.W.2d 612 (emphasis added).

The Restatement of the Law, (2d), Torts, § 46, does not include the reference to privilege contained in the 1948 definition of the tort. However, the Michigan Court of Appeals, in adopting the Restatement (2d) definition of the tort in *Warren v. June's Mobile Home Village, supra,* noted that the new language did not represent a substantive change from the language quoted in *Frishett.* 66 Mich.App. at 390 fn. 1, 239 N.W.2d 380. The question of privilege in the context of intentional infliction of emotional distress is discussed in comment (g) to § 46 of the Restatement (2d) Torts. According to the commentators, although conduct may be extreme and outrageous, it may be privileged under the circumstances. Examples include a case where the defendant has done no more than insist on his legal rights in a permissible way, or where the conduct is taken as self-defense, or in

reaction to an extreme provocation. The comment makes no reference to privilege as it is used in the context of defamation actions. Defendant relies upon the Restatement (2d), Torts, § 10, which defines common law privilege generally, as it is used throughout the restatement:

> (2) a privilege may be based upon ... (b) the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise....

To the extent Defendant argues that a common law privilege here results in an absolute defense, Defendant cites no cases in support of the proposition, and the Court is aware of none. Although the court in *Fry v. Ionia Sentinel-Standard, supra,* rejected plaintiff's claim of intentional infliction of emotional distress, that rejection was not based upon a perceived absolute privilege on the part of the defendant newspaper to publish the article. I am not persuaded that a general definition of privilege, read together with the language of the restatement on intentional infliction of emotional harm, gives rise to an absolute defense to this cause of action.

To the extent Defendant argues that a *qualified* privilege arises for the newspaper in this context, there is a similar scarcity of authority. In *Meyer v. Hubbell,* 117 Mich. App. 699, 324 N.W.2d 139 (1982), the Court of Appeals held that the circuit court had correctly denied Plaintiff's Motion to Amend to state a claim for intentional infliction of emotional distress. In reaching that conclusion, the court found, *inter alia,* that since there was a privilege for defendant to faithfully and fairly report court proceedings, the defendant's conduct was not extreme or outrageous. That case did not involve a question of the falsity of factual statements, or a reckless disregard for the truth, since it was uncontested that defendant had merely distributed copies of a court opinion. Where, as here, malice is contested, the existence of privilege does not automatically require that Defendant prevail against Plaintiffs' claim of intentional infliction of emotional distress. However, it does appear that the qualified privilege arises in this context, and will affect the proof required by Plaintiffs on this claim.

Because malice is a contested fact issue in this case, summary judgment on the basis of privilege must be denied.

### III. Conclusion

For the reasons outlined above, Defendant's Motion to Dismiss Count III of Plaintiffs' Complaint is granted, without prejudice. Defendant's Motion for Summary Judgment as to Count IV of Plaintiffs' Complaint is denied.